**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

BARBARA BAYS, *et al.*,

        Plaintiffs,

v.                                      Case No. 15-10534

MONTMORENCY, COUNTY of, *et al.*,

        Defendants.

_____/

**OPINION AND ORDER RESOLVING CROSS-MOTIONS
FOR SUMMARY JUDGMENT**

Plaintiffs, as co-personal representatives of their late son's estate, have filed this action for damages under 42 U.S.C. § 1983. Before the court are the parties' cross-motions for summary judgment. (Dkt. ## 44, 49.) The motions are fully briefed and the court conducted a hearing on October 19, 2016. For the reasons that follow, the court will grant Defendants' motion in part. However, the court will find that facts material to the liability of Defendant Donna Sigler remain in dispute and must be resolved by the jury. Accordingly, the court will deny Defendants' motion with respect to Defendant Sigler and will deny Plaintiffs' motion in its entirety.[1]

## I. BACKGROUND

The following facts are undisputed unless otherwise noted. On March 28, 2013, officers of the Montmorency County Sheriff's Department arrested and charged 28-year-old Shane Bays with "Operating - License Suspended, Revoked, Denied/Allowing a

_____

[1] Plaintiffs stipulate that Defendants Bruce Arnold, Connie Shaw, and Wilma Wolter are entitled to qualified immunity. (Dkt. # 51, Pg. ID 1362.)

Suspended Person to Operate" and "Motor Vehicle-Operation Without Security." (Dkt. #
36, Pg. ID 362, 364.) Bays was remanded to the Montmorency County Jail and placed
in the general population. (*Id.*; Dkt. # 49, Pg. ID 1013.)

Bays was arraigned via video arraignment on April 5, 2013. (Dkt. # 44-4.)
Defendant Braun and Corrections Officer Charlie High were on duty at the time, but
Defendant Braun does not recall who accompanied Bays to his arraignment. (*Id.*)
During the arraignment, Bays stated to the court on the record that he was "in the
middle of a real severe breakdown" and asked if he could go to the "hospital for a few
days and get on some medications." (*Id.*) The presiding judge, the Honorable Theodore
O. Johnson, asked if the jail had "any mental health people out there," to which an
unidentifiable representative of the Sheriff's Department responded that they would "get
someone over here to see him or take him over for it." (*Id.*) Judge Johnson then told
Bays "I'll get somebody over there to see you if you're going to be – if you can't post
bond." (*Id.*) Bays also asked to be brought to Pointe East, an inpatient mental health
treatment center attached to Alpena Regional Medical Center, a hospital near the jail.
(*Id.*) An unidentified speaker later states that the officers will "[m]ake sure he's not going
to do something stupid." (*Id.*)

On April 9, 2013, Defendant Donna Sigler, the jail nurse, completed a "Health
Screen and Health Appraisal" form. (Dkt. # 49-5.) Defendant Sigler circled "no" for
"under treatment for mental illness or suicide" but noted that Bays "needs to be seen by
mental health and evaluate[d] for being Bipolar." (*Id.*) Sigler also noted that Bays stated
he "hears voices" and described him as needing "medication for paranoid thoughts [and]
anxiety." (*Id.*) She circled "yes" to indicate that Bays should be placed in the "general

2

population with prompt referral to appropriate health care service" and circled "mental health" for "referral[] to appropriate health care service for emergency treatment" and wrote in "on discharge." (*Id.*) Sigler later testified that, at the time, Bays was "neatly groomed; looked well rested, well-nourished and healthy; was cooperative, answered questions and did not seem confused at all; and was oriented to person and place." (Dkt. # 49-6, Pg. ID 1155.)

Later that same day, Bays submitted a Jail Inmate Request Form asking to be seen by the nurse. (Dkt. # 49-7.) On the request form, Bays wrote, " I need to see the nurse today please. I'm becoming a personal disaster. I'm not able for relief. [sic]" (Dkt. # 44-7.) Defendant Sigler's notes from that second meeting on April 9 state:

> Unable to sleep at night, anxiety causing stomach nausea, able to eat, no vomiting, anxiety causing tension, causing pain in back of neck & shoulders, even if sleeps does not feel rested, was on Zanax, Visteral, feels he is always "explaining things," "severe" rage when in jail, paranoid [sic], wants to go to Point's [sic] East, inmate very distraught, wants out of jail, inmate needs counseling and mental health therapy and medication, question bi polar [sic], very difficult to focus on conversation, states everything chronic, does not change.[2]

(Dkt. # 49-7.) Sigler later clarified that her notes reflect what she was told by Bays, not necessarily her own observations. (Dkt. # 44-8, Pg. ID 632, 634.)

Defendant Sigler was the only medically-trained professional in the jail throughout Bays's incarceration, but she had no specialized training in psychology, mental health, or suicide prevention and was not qualified to diagnose or treat mental

---

[2] Xanax is used to treat anxiety disorders, panic disorders, and anxiety caused by depression. Vistaril is used as a sedative to treat anxiety and tension. Bipolar disorder is a mental health condition associated with severe mood swings, mania, and depression. (Dkt. # 44, Pg. ID 587 n.2.)

disorders, including bipolar disorder. (*Id.* at Pg. ID 623-24.) The Thunder Bay Clinic is

less than a mile from the jail, and inmates with medical needs that cannot be addressed

on site are sent to clinic or taken by ambulance to the Alpena Regional Medical Center,

to which Pointe East is attached. (*Id.*)

That same day, Defendant Sigler contacted Amy Pilarski at Northeast Michigan

Community Mental Health Authority ("CMH"), which operates through Alpena Regional

Medical Center. (Dkt. # 49, Pg. ID 1018; Dkt. # 49-6, Pg. ID 1151.) Pilarski is a

registered nurse who has been employed by CMH since 2008 as the hospital/jail nurse

liason and a member of CMH's crisis response team. (*Id.*) Although neither nurse

remembers the details of the phone conversation, Pilarski's "phone note" states:

> This clinician spoke with [Defendant Sigler]. She reports that Shane has
> been having some issues with anxiety and was wondering if Benadryl
> could be given to aide [sic] in calming him down. It was discussed that
> Shane could have 25 mg to 50 mg two to three times daily as needed. A
> Medication Review will be scheduled and clerical will contact jail staff with
> the date and time of upcoming appointment.

(*Id.* at Pg. ID 1018-19.) Pilarski later testified that she was only told that Bays was

experiencing anxiety and that if she had known about his other symptoms, she would

not have thought it was appropriate to simply give him Benadryl. (Dkt. # 49-9, Pg. ID

1212-13.) Rather, Pilarski would have told Defendant Sigler that Pilarski needed to

assess him immediately, to have him brought to CMH, or to get him to an emergency

room. (*Id.*) Pilarski stated she would have come that day or, if she could not make it that

day, then the next day. (*Id.* at Pg. ID 1214.) Instead, on April 11, 2013, Sigler and

Pilarski scheduled a May 2, 2013 appointment for Bays. (Dkt. # 49 Pg. ID 1020.)  A

phone note regarding the April 11 call indicates that Defendant Sigler declined an earlier

appointment stating that "one of the deputies was on vacation so transporting would be difficult." (Dkt. # 44-10.)

Bays made a second request to see the jail nurse, and met with Defendant Sigler for the third time on April 17, 2009. (Dkt. # 44-9, Pg. ID 653.) During this evaluation, Defendant Sigler noted that Bays appeared more relaxed and less anxious than he had in the prior visit. (Dkt. # 49, Pg. ID 1021.)

Bays was evaluated by Sigler a fourth time, in a follow-up initiated by Sigler, on April 19, 2013. (Dkt. # 44-9, Pg. ID 653.) Sigler's notes state that Bays was "tense, feeling agitated, thinks other inmates are bothering him, feels tired, not getting rest he needs, unable to get certain thoughts out of his mind, repeat thoughts over and over, paranoid thoughts, afraid of hurting others, concerned about thoughts that trouble him . . . client has been punching wall with fist . . . ." (Dkt. # 49-8.) Sigler called Pilarksi twice and left one message asking for an earlier appointment if there were any cancellations before May 2nd, but did not receive a call back. (*Id.*) She also noted that "inmate denies suicide at this time." (*Id.*) Sigler decided not to call an ambulance, which she now acknowledges she should have done, and went home for the weekend. (Dkt. # 44-8, Pg. ID 640-41.)

At some point during his incarceration, Bays made a request to speak with mental health to Defendant Officer Taurianen. (*Id.* at Pg. ID 1023.) Defendant Taurianen communicated his request to her superior, Defendant Lt. Braun. (*Id.*) Apparently, neither communicated Bays's request to the jail nurse. (*Id.*)

Sometime between 11:07 p.m. and 1:25 a.m. April 22-23, 2013, Bays hanged himself in the shower area of his cell block with a brown sheet. (Dkt. # 49, Pg. ID 1024.)

## II. STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]hat burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (internal quotation marks omitted).

The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). In evaluating a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . credibility judgments and weighing of the evidence are prohibited." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (internal quotation marks and citations omitted).

## III. DISCUSSION

Defendants argue that the individual officers are entitled to qualified immunity. The doctrine of qualified immunity shields government officials "from liability for civil

6

damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Webb v. U.S.*, 789 F.3d 647, 659 (6th Cir. 2015) (quoting *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir. 2007)). The analysis involves a two step inquiry: (1) whether, viewing the record in the light most favorable to Plaintiff, a constitutional right has been violated; and (2) whether the right at issue was "clearly established" at the time. *Id.* Courts may address either prong first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Moreover, Plaintiff must show "that each [Defendant] officer, through his or her own actions, *personally* violated [P]laintiff's rights under clearly established law. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (emphasis in original) (citations omitted)).

## A. Clearly Established

Where prison officials are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain, they impose cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Pretrial detainees are analogously protected from such mistreatment under the Due Process Clause of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). The Sixth Circuit has clearly established that "[i]f a prisoner asks for and needs medical care – including general "psychological help" – "it must be supplied," and failure to do so may constitute deliberate indifference in violation of the Fourteenth Amendment. *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989); *see also Horn v. Madison Cty.*, 22 F.3d 653, 660 (6th Cir. 1994) ("A detainee's psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies . . . .").

Defendants argue at length that "there is no general right of pretrial detainees to be correctly screened for suicidal tendencies" or "to be protected from committing suicide" and, even if there were, such a right was not clearly established. (Dkt. # 49, Pg. ID 1026, 1039-42.) Defendants' arguments are inapposite. As this court has already noted, Plaintiffs' asserted right is not to general "suicide prevention measures" but to the provision of asked for and needed medical care – a right that is clearly established in the Sixth Circuit. (Dkt. # 35, Pg. ID 357 (citing *Danese*, 875 F.2d at 1244).)

### B. Deliberate Indifference

To show a Fourteenth Amendment violation based on deliberate indifference, Plaintiffs must prove that, objectively, Bays had "a serious medical need" and that, subjectively, each individual Defendant had "a sufficiently culpable state of mind" with respect to his condition. *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (citations and internal question marks omitted).

### 1. Objectively Serious Medical Need

In the Sixth Circuit, "a serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). The "obviousness" issue is not concerned with the ability of a lay person to detect the need – that is properly considered under the subjective prong – but rather "if the average person would surely *deem* it to be one that required treatment, regardless of if such a person could easily detect it." *Gunther v. Gastineta*, 561 Fed. Appx. 497, 500 (6th Cir. 2014) (emphasis in original).

8

Defendants argue that "the decedent's mental health issues alone are not sufficiently serious – what qualifies his medical needs as 'sufficiently serious' is the fact that Bays ultimately committed suicide." (Dkt. # 49, Pg. ID 1027.) Thus, Defendants argue, the objective standard can only be met here by demonstrating that Bays "exhibited suicidal tendencies during his[] detention or that he posed a strong likelihood of a suicide attempt. (*Id.* (quoting *Perez v. Oakland Cty*, 466 F.3d 416, 424 (6th Cir. 2006)). The court disagrees. Bays's suicide is certainly the ultimate result of a failure to address his mental health issues, but those issues presented a serious medical need even if he had not taken his own life.

The record does not establish whether Bays had any diagnosed mental disorders.[3] However, Bays complained of anxiety, bipolar disorder, "severe rage," paranoia, hearing voices that were not there, agitation, being "unable to get certain thoughts out of his mind" that "troubled him" and caused him to be "afraid of hurting others," and, beyond suicide, drove him to repeatedly "punch[] the wall with [his] fist." Dkt. # 44-13.) Bays also informed Defendant Sigler that his mental issues led to him being hospitalized about a month and a half prior to his arrest. (Dkt. # 44-6, Pg. ID 618.) The court concludes that Bays's mental issues were severe enough that "an average person would surely deem them to require professional treatment" and so constitute a serious medical need. *Gunther*, 561 Fed. Appx. at 500 (holding that an average person would likely consider paranoia and schizophrenia to obviously require treatment).

---

[3] Plaintiff's proffered expert report states that Bays had been diagnosed with by Northeast Michigan Community Mental Health Services as suffering from "Bipolar Disorder" and "Schizoaffective Disorder, Bipolar type." (Dkt. # 51-2, Pg. ID 1383.) However, Plaintiff's preferred expert relies on documents not in the record. (*Id.*)

## 2. Sufficiently Culpable State of Mind

Plaintiffs must still show that each individual Defendant had a "sufficiently culpable mental state." *Johnson*, 398 F.3d at 874. The question is whether each Defendant "inferred a substantial risk of harm" and "disregarded that risk." *Gunther*, 561 Fed. Appx. at 502. In finding that the Plaintiff in *Gunther* could not meet the "inferred a substantial risk of harm" prong, the Sixth Circuit stated:

> Thus, Gunther's allegations, construed liberally in his favor, were that he told Dr. Ojubwii that he had been diagnosed with paranoia and schizophrenia and that he had been prescribed medication, and that Dr. Ojubwii thereafter did nothing to diagnose or treat him. Notably, Gunther does not allege that he repeatedly sought out treatment for his mental illness. He does not allege that he told Dr. Ojubwii that he was experiencing symptoms of or was otherwise suffering as a result of his mental illness. He does not allege that he sent the prison any medical files that pertained to his mental illness, as he did for his back pain. Nor does Gunther allege that Dr. Ojubwii or other officials either witnessed or were made aware of any episodes Gunther may have had in connection with his mental illness.

*Id.* Unlike the *Gunther* plaintiff, Bays did repeatedly seek out treatment for his mental health issues. He saw Defendant Sigler four times in ten days and repeatedly requested a transfer to Pointe East for treatment. He also complained of concrete symptoms, including hearing voices, being unable to get troubling, paranoid thoughts out of his head, "severe rage," and a concern that he might attack other inmates. (Dkt # 49-8.) A reasonable juror could conclude, based on the record taken in the light most favorable to Plaintiffs, that Defendant Sigler inferred that Bays's mental health issues presented a substantial risk of harm.

Defendants repeatedly emphasize the fact that Bays did not tell anyone that he was suicidal, and denied being suicidal when asked by Defendant Sigler. (*See, e.g.,*

10

Dkt. # 52, Pg. ID 1398.) Defendants argue, in effect, that officials cannot infer that an inmate's mental health issues pose a substantial risk of harm unless an inmate expressly tells them that he is suicidal. The court disagrees.

Inmates with mental health issues can present a serious risk of harm even if they are not suicidal. For instance, a delusional inmate could believe that he had the ability to fly, run through walls, or dodge bullets. Such an inmate, though not suicidal, would have mental health issues that posed a serious risk to his health. Bays apparently had already engaged in some level of self-destructive behavior – he had been punching the wall of his cell. (Dkt. # 49-8.) In any event, Bays's complained-of mental health issues could have led him to attack other inmates, which Bays did tell Defendant Sigler he was concerned about. (*Id.*). In addition to presenting a risk to others, attacking other inmates would endanger Bays's own health and safety.

Importantly, Plaintiffs do not allege a failure to screen for suicide risk but a failure to provide requested – and needed – treatment for severe mental health issues. Bays's eventual suicide is not the basis of the alleged constitutional violation, but a result of it. Defendant's reliance on suicide risk screening cases is misguided. Plaintiffs must show that Defendant Sigler inferred a substantial risk of harm to Bays, not that she inferred a substantial risk of suicide. *Gunther*, 561 Fed. Appx. at 502. Viewing the record in the light most favorable to Plaintiffs, a reasonable juror could conclude that Defendant Sigler made that inference.

Similarly, while Bays denied being suicidal, a reasonable juror could conclude that Sigler's repeatedly asking him about suicide suggests that she had inferred at least some risk that he would harm himself or others. *See Perez v. Oakland County*, 466 F.3d

11

416, 425-26 (6th Cir. 2006) (describing various conclusions a reasonable juror could draw from reports stating that decedent did not appear suicidal). Defendant Sigler testified in her deposition that, prior to Bays's death, she believed he needed to be put on a special watch list and observed on a more stringent basis. (Dkt. # 49-6, Pg. ID 1163.) Further, following the April 19 visit, Defendant Sigler twice called for Pilarksi in an attempt to move up his appointment with CMH. (Dkt. # 49-8.) This could suggest that Defendant Sigler had concluded that Bays's mental condition presented a relatively immediate risk – one that required examination sooner than May 2. Whether Defendant Sigler had actually made these inferences remains an unsettled question of fact that must be resolved by a jury. *Id.*

Defendants' reliance on *Cox v. Glanz* on this issue is misguided. 800 F.3d 1231, 1252 (10th Cir. 2015). In *Cox*, the decedent had calmly informed the screening nurse that he was a paranoid schizophrenic, had never contemplated suicide, and was not currently suicidal. *Id.* The nurse then told him that help was available if he needed it. *Id.* The decedent then used a computer "kiosk" system to report that he needed to "spe[a]k with someone about some problems" and committed suicide shortly after. *Id.* The Tenth Circuit held that the nurse lacked knowledge that the decedent inmate "presented a substantial risk of suicide" and so did not act with deliberate indifference by housing him with the general population. *Id.* at 1250-53.

Unlike the decedent in *Cox*, evidence in the record here suggests that Bays needed immediate treatment, or at least relatively immediate treatment, and that Defendant Sigler was aware of that need. Bays requested treatment multiple times, reported "severe rage" and being unable to stop repeating "paranoid thoughts" that

12

"troubled him," and told Sigler that he was concerned he would try to hurt others. (Dkt. # 44-8, Pg. ID 632.) While the decedent in *Cox* was apparently calm and deliberate throughout, Sigler noted that, at least at times, Bays was "very distraught" and had been punching the wall of his cell. (*Id.*) Finally, while the nurse in *Cox* only saw the decedent once – as part of the routine screening – and the decedent apparently never requested treatment, Bays sought treatment from Defendant Sigler multiple times across ten days. Here, unlike in *Cox*, the record contains sufficient evidence for a reasonable juror to determine that Defendant Sigler was aware of the risks to Bays's health and safety.

In addition to showing that Defendant Sigler was aware of the serious risk of harm to Bays, Plaintiffs must also show that she disregarded that risk. *Id.* at 500. In particular, "a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Karnes*, 398 F.3d at 875 (quotation omitted). Accordingly, "when a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoners needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Id.* However, "when the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Terrance v. Northville Regional Psychiactric Hosp.*, 286 F.3d 834, 843-44 (6th Cir. 2002) (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) (holding that a physician's assistant's failure to inform his superior or a medical doctor of a prisoner's known injured leg constituted deliberate indifference)); *see also Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724, 744 (6th Cir. 2015) ("Grossly inadequate medical care may establish deliberate indifference.") (citing *Terrance*, 286 F.3d at 843); *Hopkins*

13

*Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) ("[I]n some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all.").

An analysis of this case under this "grossly inadequate care" standard raises a factual question regarding whether Defendant Sigler acted with deliberate indifference to Bays's serious medical needs. On April 9, 2013, Bays asked to be seen by mental health and told Sigler that he was bipolar, was hearing voices, and had recently been hospitalized for his mental health issues. (Dkt. # 44-8, Pg. ID 632.) Bays requested another visit to Defendant Sigler that same day, complaining that he was "becoming a personal disaster," had "severe rage" and "paranoid thoughts;" Sigler noted he was "very distraught" and needed "counseling, mental health therapy, and medication." (*Id.*)

Defendant Sigler called Nurse Pilarski, who is qualified to handle mental health issues, that same day. (Dkt. # 44-13, Pg. ID 654.) However, Sigler apparently only told Pilarski that Bays was having "some issues with anxiety." (Dkt. # 44-10.) Had Sigler informed Pilarski of the full extent of Bays's symptoms, Pilarski testified that she would have wanted to assess Bays immediately or have him sent to the ER. (Dkt. # 44-9, Pg. ID 648-50.) Instead, Bays was given Benadryl and an appointment was scheduled for May 2, twenty-three days later. *Id.* The CMH phone note indicates that Sigler turned down an earlier appointment opportunity because "one of the deputies was on vacation so transport[ation] would be difficult." (Dkt. # 44-10.)

Defendant Sigler apparently failed to inform Pilarski of the extent of Bays's mental health issues throughout the ten day period in which he saw Sigler four times. (*Id.*) On Bays's April 19 visit, Defendant Sigler's notes read, "tense, feeling agitated, thinks other inmates are bothering him, feels tired, not getting rest he needs, unable to

14

get certain thoughts out of his mind, repeat thoughts over and over, paranoid thoughts, afraid of hurting others, concerned about thoughts that trouble him . . . client has been punching wall with fist . . . ." (Dkt. # 49-8.) Sigler called for Pilarski twice to schedule an earlier appointment, but was unable to reach her. (*Id.*) Sigler could have secured emergency mental health treatment by some other means, such as by calling an ambulance. (Dkt. # 49-6, Pg. ID 1163.) Instead, she went home for the weekend. (*Id.*) Despite her stated belief that Bays needed to be placed on a special watch list and observed on a more stringent basis, Sigler left without communicating the details or severity of Bays's condition – severe enough that she attempted to move up his appointment – to anyone. (*Id.*) The record suggests that Sigler's only communication concerning Bays was to Pilarski, to whom she apparently only mentioned anxiety.

Pilarksi's failure to communicate the severity of Shane's condition and resulting decision to treat his stated mental issues with Benadryl may represent treatment that is not merely provided "carelessly or inefficaciously," but is "so woefully inadequate as to amount to no treatment at all." *Westlake*, 537 F.2d at 860 n.5. Similarly, Sigler's provision of Benadryl and declining an earlier appointment for a more convenient one could be "decision[s] to take an easier but less efficacious course of treatment" that may demonstrate deliberate indifference. *Terrance* 286 F.3d at 843 (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). By going home for the weekend following the April 19 examination without securing emergency treatment – or communicating the severity of Bays's condition to anyone – Defendant Sigler may have disregarded a

15

known risk to Bays's health and safety.[4] A reasonable juror could conclude that any of these, or this entire course of treatment taken together, demonstrate more than mere incompetence or medical malpractice. *Id.*

Defendants argue that requesting medical care and receiving a different kind of treatment than was requested does not give rise to a claim of deliberate indifference. (Dkt. # 52, Pg. ID 1399-1400.) In support, Defendants rely on the Fifth Circuit's ruling in *Miller v. Wayback House*, 253 F. App'x 399, 401 (5th Cir. 2007).

In *Miller*, a prisoner filed a section 1983 claim against the halfway house where he had resided while on parole. *Id.* The plaintiff had told the halfway house's executive director that "his state of mind was challenging and [he] had a problem with rational thinking" and later asked a different staff member for a referral to a state mental health agency, which the second staff member denied. *Id.* The plaintiff had already scheduled an appointment for a psychological examination for later that month, and the second staff member knew about the appointment. *Id.* The Fifth Circuit explained that the "allegations show that [halfway house] personnel, to the extent that Miller vaguely informed them of his alleged mental health needs, provided treatment for him, although perhaps not the treatment Miller would have liked." *Id.* Further, the Fifth Circuit explained that "[a] prisoner's disagreement with prison officials regarding medical treatment . . . does not constitute an Eighth Amendment violation because it does not necessarily indicate that the prison officials have been deliberately indifferent to the

---

[4] Plaintiff's proffered expert report opines that Bays should have been provided emergency treatment and prison officials should have been made aware of his condition based on his reported symptoms at that time, if not earlier. (Dkt. # 51-2, Pg. ID 1389.)

prisoner's serious medical needs. *Id.* (citing *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991)).

The court agrees with Defendants' proposition that simply receiving a different kind of treatment than desired – including treatment given carelessly or negligently – does not violate one's Eighth or Fourteenth Amendment rights. The court also agrees with the Fifth Circuit's reasoning in *Miller*. But neither apply to the instant case. First, as discussed above, the issue here is not simply different treatment but treatment that a reasonable juror could find so woefully inadequate as to amount to no treatment at all – in effect, a denial of requested and needed treatment as explicitly contemplated by the Sixth Circuit in *Danese*, 875 F.2d at 1244. Second, nothing about the plaintiff in *Miller* suggests a time-sensitive risk or a need for relatively immediate medical treatment. In contrast, here the record establishes that, had Defendant Sigler communicated Bays's stated issues to Pilarksi rather than just "anxiety," Pilarski would have wanted to see him that day, or the next day, or have an ambulance called for him. (Dkt. # 49-9, Pg. ID 1212-13.)

In short, prison officials are not liable for deliberate indifference when they provide treatment different than what a prisoner requests, but that different treatment cannot be so "cursory" or "woefully inadequate" that it amounts to no treatment at all. *See Terrance*, 286 F.3d at 843; *Westlake*, 537 F.2d at 860 n.5. Here, a reasonable juror could conclude that Sigler provided such cursory or woefully inadequate treatment and that her conduct evidences deliberate indifference to Bays's serious medical needs. Accordingly, Defendant Sigler is not entitled to qualified immunity.

17

The court reaches a different conclusion with respect to Defendants Taurianen and Braun. The record shows that Defendants Taurianen and Braun only knew that Bays had asked to see mental health and that they failed to secure treatment for him. Nothing in the record suggests that they had any idea how severe Bays's mental health issues were, had reason to believe that he needed immediate or emergency treatment, or even knew that he had not actually received the requested treatment. Neither does the record show that Taurianen and Braun observed any unusual or concerning behavior, nor that they were aware of Bays's symptoms. The court concludes that the record does not suggest that Defendants Taurianen and Braun had a sufficiently culpable mental state. *Gunther*, 651 Fed. Appx. at 503. As a result, they are entitled to qualified immunity. *Id.*

### C. County Defendant

A county can be liable under section 1983 only if the plaintiff can demonstrate that his civil rights have been violated as a direct result of that county's policy or custom. *Monell v. Dept of Soc. Servs. City of New York*, 436 U.S. 658, 694 (1978). A county's failure to train and supervise its employees about "their legal duty to avoid violating citizens' rights may rise to the level of an official government policy" and constitute the "moving force" of the violation for purposes of section 1983. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Plaintiffs must show the alleged failure to train amounts to deliberate indifference to a detainee's right to constitutionally adequate medical care. *See City of Canton v. Harris*, 489 U.S. 378, 392 (1989). Specifically, Plaintiffs must show that the county's "training program and supervision were inadequate for the tasks [Sigler was] required to perform, the inadequacy resulted from [the county's] deliberate indifference,

18

and the inadequacy actually caused, or is closely related to, [Bays's] injury." *Shadrick*, 805 F.3d at 738 (quoting *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)).

One method by which Plaintiffs may show that the county failed to adequately train its jail staff is by establishing "a single violation of federal rights, accompanied by a showing that [the county] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Id.* at 739 (quoting *Board of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)) (internal quotation marks omitted). This method "is available in a narrow range of circumstances where a federal rights violation may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *Id.* (internal quotation marks omitted). In *City of Canton*, the Supreme Court elaborated on this "narrow range of circumstances" as follows:

> It may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

489 U.S. at 390. A high degree of predictability can support inferences of deliberate indifference and that the failure to train caused the complained-of injury. *Shadrick*, 805 F.2d at 739. As an example of this sort of "obvious" need for training, the Supreme Court in *City of Canton* pointed to a hypothetical municipality's policy makers "know[ing] to a moral certainty that their police officers will be required to arrest fleeing felons. 489 U.S. at 190 n.10. Having equipped the officers with firearms, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,'

19

that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.* (internal citation and quotation marks omitted).

In *Connick*, the Supreme Court held that the need to train prosecutors properly turn potentially exculpatory evidence over to defendants as required by *Brady v. Maryland*, 373 U.S. 83 (1963) was not so obvious, and the failure to train not so likely to cause *Brady* violations as to "fall within the narrow range of *Canton*'s hypothesized single-incident liability." 131 S.Ct. At 1361; *see also Dambrosio v. Marione*, 77 F.3d 378, 382 (6th Cir. 2014) (affirming dismissal of section 1983 complaint brought by exonerated death row inmate against prosecutor who violated *Brady* obligations). The Court reasoned that "[a]ttorneys are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment," and have a variety of continuing education requirements specifically dealing with legal and constitutional doctrine. *Connick*, 131 S. Ct. At 1361. Even without separate formal training provided by the prosecutors office, it was undisputed that "the prosecutors . . . were familiar with the general *Brady* rule." *Id.* At 1363.

To determine whether this case is more like *Connick* or *City of Canton*, the Sixth Circuit's opinion in *Shadrick* is helpful. In *Shadrick*, twenty-five year old Tyler Butler died three days into his misdemeanor sentence from complications resulting from an untreated infection of methicillin-resistant staphylococcus aureas, commonly called "MRSA." *Id.* at 725. Butler's mother filed sued under section 1983 against, among others, the private corporation hired by the county to provide medical services to inmates housed at the jail facility. *Id.* Plaintiff alleged that the company's failure to train

20

and supervise its nurses violated Butler's constitutional right to adequate medical care.

*Id.* In reversing the district court's grant of summary judgment, the Sixth Circuit held:

> This case mirrors the example given in *City of Canton*. The obvious need
> to train police officers who lack knowledge of the constitutional constraints
> on the use of deadly force parallels the obvious need to train LPN nurses
> who lack knowledge about the constitutional dimensions of providing
> adequate medical care to inmates in the jail setting. Unlike licensed
> prosecutors who completed law school, routinely attend ongoing
> continuing legal education classes, receive on-the-job legal mentoring,
> and labor under rules of professional responsibility to master their *Brady*
> obligations, *Connick*, 131 S.Ct. at 1361–62, LPN nurses employed within
> the prison environment may be required to make professional judgments
> outside their area of medical expertise. Unless the employer provides
> necessary training, the LPN nurses lack knowledge about the
> constitutional consequences of their actions or inaction in providing
> medical care to inmates. Because it is so highly predictable that a poorly
> trained LPN nurse working in the jail setting "utter[ly] lack[s] an ability to
> cope with constitutional situations," *id.* at 1363, a jury reasonably could
> find that SHP's failure to train reflects "deliberate indifference to the 'highly
> predictable consequence,' namely, violations of constitutional rights," *id.* at
> 1361 (quoting *Bryan Cnty.*, 520 U.S. at 409, 117 S.Ct. 1382). Unlike
> *Connick* and *D'Ambrosio*, this case falls squarely within "the narrow range
> of *Canton* 's hypothesized single-incident liability." *Connick*, 131 S.Ct. at
> 1361.

*Shadrick v. Hopkins Cnty., Ky.*, 805 F.3d 724, 742 (6th Cir. 2015).

Other district courts have faced similar questions with respect to an absence or

near-absence of training regarding serious mental health issues. In concluding that the

need for training relating to the constitutional dimensions of providing care to inmates

with serious mental health issues is analogous to the *City of Canton* example, the

Northern District of Ohio reasoned:

> According to plaintiff's expert, the percentage of inmates with serious
> mental illness ranges from 20% to 40% of all inmates. (Schwartz Report at
> 14). As even [the defendant] Feltoon acknowledged, non-medically trained
> officers are often on the front line for identifying detainees and inmates
> with mental health problems and therefore must be trained to spot the
> indicators of mental illness. Unless the City provides the necessary

training, the officers lack knowledge about the constitutional consequences of their actions or inaction in providing mental health care to inmates. Because both police officers and correctional officers in Bedford Heights inevitably came into contact with inmates and detainees with serious mental health issues, a reasonable jury could conclude that the City's training program and supervision were inadequate for the tasks the officers were required to perform.

Further, a reasonable jury could conclude that the inadequacy of the training resulted from the City's deliberate indifference. The evidence shows that the individual responsible for implementing the training programs on mental health care, Feltoon, did not take responsibility to appropriately train the nurses or officers to avoid violating inmates' constitutional rights to adequate mental health treatment for their serious mental health needs. Nor did he ensure that the officers received appropriate training from other sources, such as through correctional officer training. *See Shadrick*, 805 F.2d at 742 (finding genuine dispute of fact on whether inadequate training program resulted from provider's deliberate indifference where the evidence showed that none of the provider's administrators took responsibility to train the nurses or provide them with appropriate supervisory oversight).

*Arrington-Bey v. City of Bedford Heights*, 2016 WL 828787, at *21–22 (N.D. Ohio March 3, 2016).

This court, like the court in *Arrington-Bey*, concludes that inadequate training and supervision with respect to mental health needs of prisoners is within the broader holding of *Shadrick* – that the risk of constitutional violations posed by nurses "who lack the essential knowledge, tools, preparation, and authority to respond to the recurring medical needs of prisoners in the jail setting" could be found by a jury to be "so obvious that [a municipality or county's] failure to provide adequate training and supervision to those nurses constitutes deliberate indifference to that risk." *Shadrick*, 805 F.3d at 739-40 (citing *Farmer*, 511 U.S. at 836; *City of Canton*, 489 U.S. at 390)).

The court must then determine whether the county actually failed to provide adequate training. *Id.* at 738. Plaintiffs aver that "there is no proof of any training that

was designed to guide jail nurses in assessing and documenting medical conditions of

inmates, obtaining physician orders, providing ordered treatments to inmates,

monitoring patient progress, or providing necessary emergency care to inmates within

the jail environment in order to avoid constitutional violations." (Dkt. # 51, Pg. ID 1373.)

However, neither is there evidence of the *absence* of such training. The Sixth Circuit's

discussion of the record in *Shadrick* provides an instructive contrast:

> The lack of training and supervision by [the defendant] SHP is clearly evidenced by the blanket inability of the LPN nurses who worked at HCDC to identify and discuss the requirements of SHP's written policies governing their work. *See* [*Russo v. City of Cincinnati*, 953 F.2d 1036, 1046] (noting police officers were unable "to give specific responses as to the content of their training.") The nurses professed ignorance of the written medical treatment protocols and policies purportedly drafted by SHP to guide their conduct. The nurses denied receiving ongoing training about their medical responsibilities within the jail setting, and they disclosed that their superiors did not give feedback or regular evaluations to let them know whether they performed appropriately. A genuine issue of material fact exists about whether SHP required the nurses to sign documents attesting that they had read and understood the SHP policies and protocols. Most troubling is the admission of Angela Pleasant, SHP's on-site nursing manager at HCDC, that she was not familiar with the SHP policies she was specifically designated to enforce. Key here also is her open acknowledgement that SHP nurses followed an undocumented policy and custom of providing medical assistance only if an inmate asked for it, despite the existence of written policies, procedures, and treatment protocols mandating that nurses take particular actions at particular times.
>
> Two high-level supervisors disclaimed any responsibility for training and supervising the LPN nurses. Dr. Davis denied that it was his job to train or supervise them, and Betty Dawes, SHP's regional administrator, conceded that she did not offer any type of training program or insure that the nurses were trained to carry out their responsibilities. Further, because she never compared the SHP policies to the jail policies to find any conflicts within them, she made no effort to clarify the proper course of conduct for nurses in instances of policy conflict.
>
> Shadrick traced the lack of adequate training and supervision to the top of SHP's organization. President Hairsine is not college-educated or medically trained, and she could not explain the differences in the

23

permitted scope of medical practice for LPNs and RNs. Rather than provide training and supervision necessary to insure that LPN nurses acted within the scope of practice, SHP expected the nurses to define that scope for the company. Hairsine pointed to the SHP policies and treatment protocols as proof of instruction, yet she candidly admitted that SHP allowed LPN nurses to use the policies and protocols in their discretion, even though a critical document like the MRSA policy mandated immediate implementation of a specialized treatment protocol. Shadrick's expert witness opined that SHP failed to provide adequate training and supervision to the LPN nurses. See *Russo*, 953 F.2d at 1047 ("Especially in the context of a failure to train claim, expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of . . . training procedures.")

*Shadrick*, 805 F.3d at 740–41.

The record here is not at all like the record in *Shadrick*. Plaintiffs point to no testimony in the record in which Defendant Sigler – or any other employee – professes ignorance or misunderstanding of protocols or policies, nor to testimony establishing whether such policies exist and are generally observed. Nor do Plaintiffs point to confusion regarding who is ultimately responsible for supervising the medical care provided at the jail. While Plaintiffs' expert opines on the failures of individual Defendants, his testimony is conspicuously silent as to the county's culpability. (Dkt. # 51-2.) Because Plaintiff has failed to point to evidence in the record by which a reasonable jury could find that the county failed to provide adequate training, the county is entitled to summary judgment. *Bennett*, 410 F.3d at 817

### IV. CONCLUSION

For the foregoing reasons, IT IS ORDERED that Defendants' Motion for Summary Judgment (Dkt. # 49) is GRANTED IN PART. Defendants' Motion is DENIED with respect to Defendant Sigler. Defendants' Motion is GRANTED with respect to all

24

other Defendants. IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary

Judgment (Dkt. # 44) is DENIED.

    /s/ Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  November 16, 2016


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, November 16, 2016, by electronic and/or ordinary mail.

    s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522